Filed 6/26/24  In re W.P. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| In re W.P., a Person Coming Under the Juvenile Court Law. | C099903 |
| EL DORADO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>K.P.,<br><br>Defendant and Appellant. | (Super. Ct. No. 22JD0047) |

Mother K.P. appeals from the juvenile court's November 7, 2023 order terminating mother's parental rights and freeing minor W.P. for adoption. (Welf. & Inst. Code, § 366.26.)[1] Mother argues the juvenile court erred in finding it was likely minor would be adopted. We will affirm the juvenile court's orders.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

1

## I. BACKGROUND

Minor was taken into protective custody in August 2021, when he was about eight months old. In August 2021, the El Dorado County Health and Human Services Agency (the Agency) filed a section 300 petition on behalf of the then eight-month-old minor, alleging: (1) mother had a substance abuse problem that impaired her ability to adequately care for minor; (2) minor had been diagnosed with a rare immunodeficiency that keeps the minor's immune system from functioning properly, and mother had failed to obtain proper medical treatment for minor; and (3) father (who is not a party to this appeal) had a substance abuse problem and was unable to adequately care for minor. (§ 300, subd. (b)(1).) The petition further alleged minor tested positive at birth for fentanyl and methadone. In addition, mother delayed getting medical treatment for minor when he had a bleeding episode, and she had delayed a needed stem cell transplant for minor.

Minor was detained and initially placed with a foster family. On August 5, 2022, the minor was then placed with the maternal aunt. The maternal aunt gave up placement of minor on August 24, 2022, because mother was harassing maternal aunt. Minor was placed in a resource family home. No other family members were willing to take placement of minor given his significant medical needs.

An August 2022 jurisdiction report noted that minor saw a hematologist and immunologist through UC Davis Medical Center for his immunodeficiency. Minor needed a stem cell transplant at UC San Francisco Medical Center (UCSF). The entire procedure would take nine months, including 10 to 14 days of chemotherapy, a six-week hospitalization after the transplant, and then two to three months of medical housing near UCSF. The procedures had not been scheduled, and mother was not able to use hospital housing because of her substance abuse problems. Minor would get sicker the longer he waited for the transplant. Mother failed to properly use oral and topical medication that had been prescribed for minor. Mother also refused to participate in services.

A September 2022 disposition report noted that minor needed numerous daily medications to support his immunity and platelets from decreasing. His condition is characterized by recurrent infections, and his lower immune system could lead to significant bleeds. As a result of his condition, minor suffered from eczema and other skin rashes. The rashes had grown worse lately, probably because his condition was worsening. Minor also required a monthly intravenous immunoglobulin treatment. The social worker was working diligently to find a caregiver who could support minor during the stem cell transplant, which would likely require the caregiver to stay with minor in the hospital for three months, and then live within 30 minutes of the hospital for another three months after that. After that initial six-month period, minor would need weekly or monthly follow-up appointments at UCSF. Minor was described as a "resilient, lovable and cuddly baby."

During the October 2022 jurisdiction hearing, the court sustained the petition and took jurisdiction. That same day, the court proceeded to disposition and declared minor a dependent and ordered out-of-home placement for minor. The court also ordered services and twice-weekly supervised visitation for mother. The court also suspended mother's medical rights. A six-month review hearing was set for March 2023.

In January 2023, the court granted the Agency's request to suspend mother's visitation. Mother's visits had been sporadic, and minor was undergoing difficult medical treatments. The court reasoned minor's visits with mother were detrimental.

The March 2023 six-month status report noted minor was currently undergoing medical treatment at UCSF and residing in medical housing. Minor had received chemotherapy and other conditioning for the transplant in January 2023, and then the transplant on February 3, 2023. He was doing well, and he had moved to medical housing with his caregiver on March 1, 2023. It was expected minor would continue to live in medical housing for two to three months so he could receive additional treatment, including regular intravenous immunoglobin treatment. Minor's development had

3

progressed significantly since he started living in medical housing. Minor would need follow-up care for several years as his body and immune system adjusted, including regular intravenous immunoglobulin treatments. Follow-up care was critical to ensure the transplant was successful.

The report further noted mother was not participating in services, and she had not visited with minor since early November 2022. The social worker recommended terminating mother's services and setting a section 366.26 hearing. The juvenile court did so during the April 2023 contested six-month review hearing.

In August 2023, the Agency requested to use two specialized placement services. Minor had been with his current caregiver since January 2023, but the caregiver was unable to provide a permanent home given minor's medical needs. Three families had responded to the Agency's search for a permanent home for minor. But, two of these families decided not to pursue placement due to minor's medical needs. The third family was not a certified resource family. The court granted the Agency's request and subsequently continued the section 366.26 hearing to give the Agency more time to find an adoptive home for minor.

In a September 2023 report, the social worker described that 11 families had been identified as potential placements for minor, with other families expressing interest. The initial 11 were reduced to six who remained interested after learning some of the specifics about minor's medical history. Three of those families had committed to providing a permanent home for minor after learning all that the Agency was able to disclose to them about minor's condition. The three families had an hour-long meeting with minor's medical team at UCSF detailing minor's medical history, as well as possible best and worst-case medical outcomes.

It was decided it was in minor's best interest to only introduce him to one of these three families. The family was selected based on its "firm commitment to providing permanence for [minor]," as well as the family's experience in raising children (they

4

already had four children), and ability to understand complex information and act appropriately. The family also articulated a clear plan for caring for minor, had a robust support system, and had the means to provide for paid support if necessary. The family was geographically close to the current caregiver, which would allow for a "longer and more thoughtful transition plan." The first visit with the selected family occurred on September 11, 2023, and it went "very well." Minor "warmed up quickly" to the prospective adoptive parents, and they "seemed adept at identifying his needs."

The report further noted minor had been released from the hospital in early September 2023 and temporarily placed in medical housing until he was returned to his current caregiver. Minor's medical team warned it was possible minor might need another stem cell transplant, but the team could not estimate the exact likelihood. Minor's physician was "pleased" with minor's overall health and "optimistic" that minor would continue to progress positively.

An October 2023 report noted that, after minor's first meeting with the prospective adoptive parents, the current caregiver and the prospective adoptive parents were "asked that they work directly together to arrange . . . face-to-face time" between minor and the prospective adoptive parents "on a daily basis." They had an overnight visit starting September 22, and minor remained with them until he was officially placed there on September 29. On October 4, the prospective adoptive parents participated in a 90-minute meeting with minor's transplant physician to discuss minor's medical future and what to expect in caring for him, "including emergencies such as a fever that may require a trip to UCSF for an extended stay or even the potential for a new transplant and the time in hospital that would be required." Since that meeting, the prospective adoptive parents have attended weekly clinic visits with minor at UCSF.

The report further noted minor was developmentally delayed, due in part to his extensive hospitalization. Still, minor had received mitigating treatment at UCSF, and he was making progress. Since being placed with the prospective adoptive parents, he had

5

"dramatically increased babbling, a precursor to speech." He was also beginning to show signs of being ready to walk. He also showed signs of speech comprehension, and he was able to communicate his needs with signs.

The report also noted that, by the end of October, minor's medical team opined it was becoming increasingly "likely" that minor would need another stem cell transplant. Minor's physician shared this information with the potential adoptive parents, and, while they were "sad for [minor]," they were "100% committed to seeing him through any necessary transplant, the months they will be required to be with [minor] in the hospital, and to provide a permanent home for [minor]." They had known this was a possibility, and this news "d[id] not change their mind[s]." The prospective adoptive parents considered themselves well suited to meet minor's "significant needs" and were committed to providing the care he needs.

During the November 7, 2023 section 366.26 hearing, the juvenile court found by clear and convincing evidence that minor was likely to be adopted. The court terminated mother's parental rights.

## II.  DISCUSSION

Mother argues the juvenile court erred in terminating her parental rights because there was insufficient evidence that minor was likely to be adopted within a reasonable time. Mother notes minor has serious medical problems that require his caregiver's "constant attention." Mother also points to the fact that: (1) minor had six placements; (2) the Agency had difficulty finding a prospective permanent home for minor; and (3) at the time of the section 366.26 hearing, he had only been in his current placement for five weeks. We are not persuaded.

A finding of adoptability requires "clear and convincing evidence of the likelihood that adoption will be realized within a reasonable time." (*In re Zeth S*. (2003) 31 Cal.4th 396, 406.) "The issue of adoptability requires the court to focus on the child, and whether the child's age, physical condition, and emotional state make it difficult to find a

6

person willing to adopt. [Citations.] It is not necessary that the child already be placed in a preadoptive home, or that a proposed adoptive parent be waiting. [Citations.] However, there must be convincing evidence of the likelihood that adoption will take place within a reasonable time." (*In re Brian P*. (2002) 99 Cal.App.4th 616, 624.) The fact that a prospective adoptive family is willing to adopt the minor is evidence that the minor is likely to be adopted by that family or some other family in a reasonable time. (*In re Lukas B*. (2000) 79 Cal.App.4th 1145, 1154.)

The term "specifically adoptable" denotes a child who, but for the existence of a prospective adoptive parent, would not be adoptable. (*In re Carl R*. (2005) 128 Cal.App.4th 1051, 1062.) Although the suitability of the prospective adoptive parent is not an issue when the child is generally adoptable, it may be placed in issue when the child is specifically adoptable. (*Ibid*.)

"When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B*. (2020) 9 Cal.5th 989, 1011.) "We give the court's adoptability finding the benefit of every reasonable inference and resolve any evidentiary conflicts in favor of the judgment." (*In re Valerie W*. (2008) 162 Cal.App.4th 1, 13.)

Here, the record supports the juvenile court's finding that the minor is likely to be adopted within a reasonable time. Although the minor had significant and ongoing medical issues, there had been three families who were still interested in adopting minor after learning detailed information about minor's existing needs and potential medical future. After these three families had a detailed meeting with minor's medical team, the Agency selected the one family that it thought was best suited and most committed to minor. That family had experience raising children and the ability to understand complex information and act appropriately. The family also articulated a clear plan for caring for

7

minor. In addition, they had a robust support system and the means to obtain paid support if necessary.

Things went "very well" between minor and this family from the first time they met on September 11, 2023. The prospective adoptive parents then had increasing face-to-face time with him until his first overnight visit on September 22, which went so well that he stayed with them until he was officially placed there on September 29. The prospective adoptive parents met weekly with his medical care team, including a 90-minute in-depth meeting to discuss minor's current medical needs and future concerns. When minor's medical team indicated it was looking more likely minor might need another stem cell transplant, the prospective adoptive parents reiterated they were "100% committed to seeing him through any necessary transplant" and providing him with a permanent home. They saw themselves as well suited to meeting his needs, and they were committed to caring for him.

Moreover, minor was thriving with the prospective adoptive parents. He had shown signs of increased ability to communicate, and he was showing signs of starting to walk.

It is true that minor had only been with the prospective adoptive parents for five weeks when the juvenile court found it was likely minor would be adopted within a reasonable time. However, mother points to no legal authority indicating this is an automatic barrier to the court's finding. Although he had multiple prior placements, this was not necessarily due to the caregiver being overwhelmed by minor's medical issues. He was moved from his initial foster family to be placed with maternal aunt, who proceeded to ask for a change because mother was harassing her. Minor spent the longest with the caregiver who helped him through the first stem cell transplant. Although this caregiver ultimately asked for a change, minor's next placement was with the prospective adoptive parents. These prospective adoptive parents were well-informed about minor's current and future medical needs, having had numerous meetings and in-depth

8

discussions with his medical team. They remained committed to him, even after finding out it was growing increasingly likely that minor would need another stem cell transplant. This fact is itself evidence that the minor was likely to be adopted, by that caregiver or another, within a reasonable time. (See *In re Lukas B., supra*, 79 Cal.App.4th at p. 1154.) Accordingly, we find substantial evidence supports the juvenile court's finding that minor was likely to adopted with a reasonable time.

## III. DISPOSITION

The juvenile court's orders are affirmed.

/S/

_____

RENNER, Acting P. J.

We concur:

/S/

_____

BOULWARE EURIE, J.

/S/

_____

MESIWALA, J.

9